**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**NORFOLK DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 2:13cr40 |
| | ) | |
| ANTONIOS BOUMPOUTELOS, | ) | |
| | ) | |
| | ) | |
| *Defendant.* | ) | |

GOVERNMENT'S POSITION WITH RESPECT TO
SENTENCING FACTORS IN THE PRESENTENCE REPORT

COMES NOW the United States of America, by undersigned counsel, and in accordance with Section 6A1.2 of the Sentencing Guidelines and Policy Statements and this Court's policy regarding guidelines sentencing, the United States hereby represents that it has reviewed the presentence report (PSR) prepared by the United States Probation Officer.

I.      **The United States Objects to the PSR**

Subornation of Perjury. The United States objects to the Sentencing Guideline calculation because it does not contain an enhancement pursuant to Section 3C1.1 of the Sentencing Guidelines for obstruction of justice.   Boumpoutelos, through the introduction of the testimony of Oleksiy Alekseyeyv, suborned perjury as contemplated by Application Note 4(B). Alekseyeyv falsely testified that the bypass pipes were not onboard the M/V Thetis while he was working onboard.   Alekseyeyv's testimony was contradicted by the testimony of the engineering crewmembers and the photograph of the bypass pipes installed on M/V Thetis during the time Alekseyeyv was working on the ship.   Because Boumpoutelos procured this testimony and was aware that it would be false prior to introducing it, he should be assessed an

enhancement under this section.    Subornation of perjury consists of three elements: the suborner (1) "should have known or believed or have had good reason to believe that the testimony given would be false; (2) should have known or believed that the witness would testify willfully and corruptly, and with knowledge of the falsity; and (3) should have knowingly and willfully induced or procured the witness to give such false testimony."    *U.S. v. Ethridge*, 519 Fed.Appx 828, 830 (4th Cir. 2013) (citing *Petite v. United States*, 262 F.2d 788, 794 (4th Cir. 1959).    To procure the deposition testimony of Alekseyeyv, defendant filed with this Court a motion to compel the deposition and provided a summary of expected testimony which included statements that the magic pipes were not on the vessel and that they were never used.    ECF Doc 43-4 at 3. Defendant knew that what Alekseyeyv would testify to would be false. Not only did the defendant know that Alekseyeyv would testify falsely, he actively campaigned to acquire his testimony by asking the Court to order that his deposition be taken overseas and on the eve of trial.    After knowingly and intentionally procuring Alekseyeyv's false deposition testimony, defendant introduced that deposition into evidence.

The United States contends that Boumpoutelos should receive an additional two level enhancement under Section 3C1.1.    As such, his total offense level would be 21 and the properly calculated guideline range would be 37-46 months.

## II.    **Evidence**

The United States intends to introduce into evidence an affidavit from Coast Guard Captain David S. Fish appended hereto as Exhibit A, an excerpt from *United States v. Oria*, 08-CR-1027 (D. Mass. May 6, 2009), appended hereto as Exhibit B, and a report from the Organization for Economic Co-operation and Development entitled, "Cost Savings From

Non-Compliance with International Environmental Regulations in the Maritime Sector," appended hereto as Exhibit C.

### III.    Defendant's Objection to Being in the Conspiracy

The defendant objects to the factual assertions that he was a part of the conspiracy that started in October 2011.   Defendant contends that he did not get onboard the vessel until May 2012, and therefore was not a part of the conspiracy that started in October 2011.   The United States contends that even though defendant did not arrive on the vessel until May 2012, he joined into the existing conspiracy that began in October 2011.

### IV.    Defendant's Objection Related to the Oil Record Book

The defendant repeatedly asserts that there was no evidence that he ever saw or knew of the contents of the Oil Record Book.   However, in Government's Exhibit (GE) 1, the defendant repeatedly (nearly weekly) signed entries in the Oil Record Book for transfers from the sludge tank to the incinerator tank and for the incineration of sludge.   Therefore, defendant's repeated claim that he never saw the Oil Record Book and could not have known of its contents is untenable.

### V.    Defendant's Objection Related to Ordering the Use of the Magic Pipe

Defendant objects to the characterization that he ordered the installation and use of the bilge bypass magic pipe because he received his orders from the Chief Engineer.   At trial the engineering crewmembers testified that they received the orders to install, use, and hide the magic pipes from both the Chief Engineer and the defendant.   Therefore, it is accurate to state that defendant ordered the installation, use, and concealment of the magic pipes even if he was originally given the order from the Chief Engineer.

3

## VI.  Defendant's Objection to Enhancement for Role in the Offense

Defendant objects to the three level increase of the offense level pursuant to §3B1.1(b) because he claims that he was neither a "manager or supervisor" nor that the criminal activity involved five or more participants.  Defendant was indeed a "manager or supervisor" as the evidence adduced at trial proved that he was in overall day-to-day control of the actions of the engineering crew.  Defendant would receive work instructions from the Chief Engineer and pass them on to the engineering crew and ensure that they were completed.  The junior engineering crew reported back to defendant on work progress and completion.  Government Exhibit 32B contains a description of the duties of the defendant which includes "[t]o plan, organize and supervise (in co-operation with the Chief Engineer and through Engineering staff) the optimum operation and maintenance of the Engine Department and mechanical maintenance throughout the vessel."  In addition the defendants' duties include "the organization and supervision of all other engine department staff."  Defendant's description of duties in Government Exhibit 32B coupled with the testimony of the crewmembers clearly show that he was a "manager or supervisor."

In his objections submitted to the Probation Officer, defendant maintains that there was no evidence that there were five or more participants in the criminal activity for which he was convicted.  In support of this, defendant first argues that he was convicted of failing to accurately maintain the Oil Record Book (Counts 3 and 4) and that the Chief Engineer had the sole responsibility for making entries in the Oil Record Book and that defendant never saw or knew that contents of the record.  First, defendant's contention is factually erroneous as he did in fact see and sign the Oil Record Book as shown in Government Exhibit 1.  Second, defendant had an obligation, pursuant to 33 CFR 151.25(h), to make an entry in the Oil Record

4

Book for the use of the magic pipe since he was a "person or persons in charge of the operations concerned."

Even if, for the sake of argument, that defendant had no role in maintaining the Oil Record Book, defendant conveniently ignores that he was also convicted of five other felony counts including conspiracy, falsification of records, and the concealment of a tangible object in a federal investigation.   Defendant was convicted of Count 1 which charged him with conspiring to violate the Act to Prevent Pollution from Ships, 33 U.S.C. § 1908(a) to knowingly fail to maintain an Oil Record Book; to violate 18 U.S.C. § 1519 for falsifying the Oil Record Book with the intent to obstruct a federal investigation; and to violate 18 U.S.C. § 1519 by concealing a tangible object (magic pipes) with the intent to obstruct a federal investigation.   In order to effectuate the conspiracy, defendant ordered junior engineering crew to install, use, and hide the magic pipe.   Defendant failed to make any entries in the Oil Record Book notating the use of the magic pipe despite the fact that he routinely signed the Oil Record Book.   There is no dispute that there were five junior engineering crewmembers that were junior to the defendant and involved in the conduct that defendant ordered.   The evidence at trial conclusively established that the activities of the five junior crewmembers in installing and then hiding of the "magic pipes" occurred, at least in part, at the direction of the defendant.   Therefore the sentencing enhancement of three levels is appropriate pursuant to §3B1.1(b).

Defendant cites to *U.S. v. Sanford*, 1:11-cr-00352 (D.D.C. Jan. 11, 2013) for the proposition that the court should refuse to apply a supervisory enhancement for a recordkeeping violation where only one individual was responsible for entries in the Oil Record Book.   This case is distinguishable from *Sanford* because the defendant in *Sanford* was neither convicted of conspiracy nor of obstruction of justice for the concealment of tangible objects.   The defendant

in Sanford was only convicted of Oil Record Book violations.   In this case, defendant was convicted of the much broader and more serious course of criminal conduct that included obstruction of justice.   The defendant was not simply convicted of false entries in an oil record book.   Rather, the defendant was convicted of participating in a conspiracy, ordering the installation of a "magic pipe" and ordering the seclusion of the "magic pipe" above the engine control room to obstruct any potential Coast Guard inspector from finding it.   Thus, defendant's conduct is much more involved and wide ranging than the defendant in *Sanford* and the enhancement is appropriate in the instant case.

## VII.   <u>Defendant's Objection to Grouping</u>

Defendant objects to Counts 1, 3 and 4 being grouped separately from Counts 1, 6, 7, 9 and 10 because all the counts involve the same conduct or harm.   Pursuant to §3D1.2 counts should be grouped when they involve the same victim and the same act or transaction. Application Note 2 defines a "victim" to not only include a person who is harmed, but also the "societal interest" that is harmed.   In this case, there are two distinct societal interests that are harmed: (1) the preservation of the marine environment, and (2) the integrity of the Coast Guard's Port State Control program.   Counts 1, 3 and 4 all relate to the failure to accurately maintain an Oil Record Book pursuant to the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. § 1908(a).   APPS is the United States' domestic implementation of the MARPOL treaty. MARPOL recognized the deliberate release of oil from ships constitutes a serious source of pollution and seeks the "complete" elimination of intentional pollution of the sea.   MARPOL Protocol, 1340 U.N.T.S. 61.   MARPOL mandates that Parties to MARPOL "undertake to give effect to the provisions of [MARPOL] in order to prevent the pollution of the marine environment…"   Furthermore, Parties to MARPOL are to establish penalties for the violation of

MARPOL that are "adequate in severity to discourage violations of [MARPOL] and shall be equally severe irrespective of where the violations occur." *Id.* at Article 4.   Just as in 33 C.F.R. §151.25, MARPOL requires that vessel's maintain an Oil Record Book wherein the entries are signed by the persons or persons in charge of the operation, *Id.* at Regulation 17.   One manner in which the United States enforces its obligations under MARPOL is to make it a felony to knowingly fail to maintain an accurate Oil Record Book.   There are often occasions, just as in this case, where the engineers choose to dump oily waste beyond the jurisdiction of the United States. Therefore in order to discourage violations of MARPOL, the United States enforces the recordkeeping requirements of MARPOL and proscribes that a knowing violations is a class D felony.   33 U.S.C. § 1908(a).   The preservation of the marine environment is the first "societal interest" that is relevant for counts 1, 3, and 4.

The second "societal interest" is the preservation of the integrity of the Coast Guard's Port State Control program.   The Coast Guard routinely inspects ships for compliance with MARPOL and numerous other international treaties that government the safe operation of ships.   Coast Guard inspectors routinely rely on the veracity of the ship's documents and the truthfulness of the ships' crew to determine if the vessel is being operated safely and complies with international and domestic laws restricting the pollution of the sea.   Defendant knew that the M/V Thetis was not being operated properly because he had routinely ordered that the bilge water magic pipe be installed to discharge the bilge tank directly into the sea without using the Oil Water Separator.   In fact the testimony at trial was that the magic pipe was used on every single voyage the vessel undertook.   Defendant never recorded the use of the magic pipe in the Oil Record Book.   In addition, he ordered that the magic pipe be hidden on top of the Engine Control Room knowing that the Coast Guard was very unlikely to ever inspect that area during a Port State Control

inspection.   Defendant sought to intentionally deceive the Coast Guard about the true nature in which the M/V Thetis was operated.   Therefore, the counts are properly split into two groups that each have a different "victim" or "societal interest."

## VIII.   Defendant's Objection to Enhancement for Discharge

The defendant objects to the 6 level enhancement pursuant to Section 2Q1.3(b)(1)(A) for a repetitive discharge or emission of a pollutant into the environment.   Defendants' first basis of objection is that it is inappropriate to consider discharges outside of United States' waters under Section 2Q1.3(b)(1)(A).   In support of this position, defendant cites to the Third Circuit case of *U.S. v. Abrogar*, 459 F.3d 430 (3rd Cir. 2006).   *Abrogar* held that improper discharges of oily bilge waters and oily sludges from a foreign vessel that occurred outside U.S. waters were not "relevant conduct" for offense of conviction of failure to maintain an accurate oil record book inside U.S. waters.   *Abrogar*, 459 F.3d. at 473.   This case is not binding on this Court and the government continues to respectfully disagree with this decision.   In *United States v. Oria*, 08-CR-1027 (May 6, 2009), the court concluded that:

> "to talk about a reporting offense involving an actual discharge and, then, treating the actual discharge as if it were not involved is the equivalent of the old Zen Cohen(sic) of appreciating the sound of one hand clapping.   They are inextricably intertwined.   The discharge is directly involved.   There is no other way of looking at it, and, to the degree that an argument is made that this would be replicative because Section Five [2Q1.3(b)(5)] would lead to the same result, the concealment of a substantive environmental offense, I reject it."

*See* Exhibit B.   Courts are permitted to consider all relevant conduct, regardless whether it occurred in the United States or not.   *See United States v. Wilkinson*, 169 F.3d 1236, 1238-1239 (10th Cir. 1999) (stating "It would be absurd to suggest that there is a long-standing principle that judges cannot consider in calculating a sentence relevant conduct committed outside of the United

States.   In fact, 18 U.S.C. § 3661 clearly states otherwise, requiring that, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.")   Therefore, it is entirely appropriate for the Court to consider that defendant repetitively ordered the discharge of untreated machinery space bilge water directly into the sea and therefore the six level enhancement pursuant to Section 2Q1.3(b)(1)(A) is appropriate.

Defendant next contends that there was no evidence that there was any evidence of actual environmental contamination from the discharges.   In *U.S. v. Strandquist*, 993 F.2d 395, 400 (4th Cir. 1993) the court noted that under Section 2Q1.3(b)(1)(A) the "matter of proof of contamination has not yet been decided by the Fourth Circuit and need not be decided here….the district court's finding of contamination is not clearly erroneous."   *Id*.   The court further stated "Though the evidence at trial did not reveal vast or permanent contamination, sufficient circumstantial evidence was produced for the court to infer environmental contamination from the discharges."   *Id*.   The requirement found in MARPOL, APPS and the Coast Guard regulations which require that machinery space bilge water be processed through the Oil Water Separator is premised on the fact that machinery space bilges on large commercial vessels are in fact contaminated with oil. Government Exhibit 34P, the sample from the Bilge Water Tank was tested positive for oil. Government Exhibit 34C, the bypass pipe used to circumvent the Oil Water Separator, also tested positive for oil.   Defendant contends that there was no evidence that any oily water with a concentration of greater than 15ppm was discharged.   To the contrary, the government's evidence established that the bilge holding tank was routinely discharged by means of the "magic pipe." Furthermore, a comparison of Government Exhibits 44A and 34P demonstrates that the content of

9

the bilge holding tank of the M/V Thetis, and thus the content of these illegal discharges, was an oily water mixture greater than 15 ppm.   Government Exhibit 44A is a sample containing 15 ppm of oil to water, and the oil is invisible to the naked eye, while Government Exhibit 34P, a sample from the bilge holding tank, contains visible oil.   Not only does MARPOL presume that machinery space bilge water is contaminated, the government's proof at trial demonstrated that it was.

## IX.   Defendant's Objection to "Guideline Inflation"

Defendant objects to using the base offense level of 14 pursuant to Section 2J1.2 for his offenses of conviction for Counts 6, 7, 9 and 10 because to do so would be improper "guideline inflation."   Defendant cite to no authority in support of this proposition.   Defendant was convicted of four counts of violating 18 U.S.C. § 1519 for the intentional falsification of the Oil Record Book in anticipation of a Coast Guard Port State Control inspection and for ordering the magic pipe to be hidden on top of the Engine Control Room knowing the Coast Guard inspectors would not normally inspect that area.   Appendix A of the Guidelines refers to Section 2J1.2 as the appropriate base Guidelines.   Defendant maintains that his offenses of conviction are not with the scope of the Background commentary of Section 2J1.2.   However, defendant's offenses, as described supra, fit squarely within the commentary as his actions sought to obstruct an administrative proceeding, namely, a Port State Control inspection.   Defendant cannot cite to any authority that supports his contention that using Guideline Section 2J1.2 is improper "guideline inflation" for a conviction of 18 U.S.C. § 1519.

This type of criminal conduct - altering documents to obstruct any government function - is the very type of conduct that 18 U.S.C. § 1519 is designed to prevent and punish, and why USSG Section 2J1.2 is the appropriate sentencing guideline.   Congress developed section 1519 as a part

of the Sarbanes-Oxley Act to remedy the "loopholes" created by the "patchwork" of the other

obstruction of justice statutes contained in Title 18 and stated that it is to be used broadly in

application:

> "Section 1519 is meant to apply broadly to any acts to destroy or
> fabricate physical evidence so long as they are done with the intent
> to obstruct, impede or influence the investigation of proper
> administration of any matter, and such matter is within the
> jurisdiction of an agency of the United States, or such acts done
> either in relation to or in contemplation of such a matter or
> investigation. This statute is specifically meant not to include any
> technical requirement, which some courts have read into other
> obstruction of justice statutes, to tie the obstructive conduct to a
> pending or imminent proceeding or matter. It is also sufficient that
> the act is done 'in contemplation' of or in relation to a matter or
> regulation. It is also meant to do away with the distinctions, which
> some courts have read into obstruction statutes, between court
> proceedings,   investigations,   regulatory   or   administrative
> proceedings (whether formal or not), and less formal government
> inquiries, regardless of their title. Destroying or falsifying
> documents to obstruct any of these types of matters or
> investigations, which in fact are proved to be within the jurisdiction
> of any federal agency are covered by this statute ... The intent of the
> provision is simple; people should not be destroying, altering, or
> falsifying documents to obstruct *any* government function."

S. REP. NO. 107-146, pp. 14-15 (2002)(emphasis added).

Defendant next contends that the proper Guideline to use in this matter is Section 2E5.3

which is titled "False Statements and Concealment of Facts in Relation to Documents Required

by the Employee Retirement Income Security Act; Failure to Maintain and Falsification of

Records Required by the Labor Management Reporting and Disclosure Act; Destruction and

Failure to Maintain Corporate Audit Records."   Clearly defendant was not charged with any of

these described crimes.   Defendant contends that his conduct was less severe than that

contemplated in Section 2J1.2 and thus using the base offense level of 6 under Section 2E5.3 is

more appropriate.   Defendant has utterly failed to appreciate the severity of the actions he

knowingly and intentionally undertook.   He was engaged in a concerted effort to prevent the Coast Guard from ascertaining that the M/V Thetis was not operated properly and that he was ordering the crew to illegally dump oily waste.   The consequences of getting caught were severe.   If the Coast Guard Captain of the Port was aware that the vessel was illegally dumping, he could prevent the vessel from entering port and engaging in commerce – costing the owner and operator potentially millions of dollars.   The Captain of the Port could also detain the vessel which would again cost the owner and operator.   The most significant factor is that defendant was trying to dupe the Coast Guard into believing everything was operating on the ship properly. This worked fine until a junior crewmember blew the whistle.   Defendant never took any steps to stop the illegal discharges or report them to the Coast Guard or anyone else.   Falsifying a corporate audit report is not remotely comparable to the severity and significance of the criminal conduct that defendant engage in here.   Moreover, pursuant to Section 2E5.3(a)(2)(C), if the offense (which is not applicable here) involved obstruction of justice, then apply Section 2J1.2 which was appropriately done in this case.

## X.      Acceptance of Responsibility

Defendant asserts that he has accepted responsibility for his actions.   The government is unaware of any such acceptance and has unaware of any instance in which the defendant has admitted his guilt.   Even if the defendant has privately admitted guilt to himself, his assertions in his objections of the PSR are an attempt to obfuscate and minimize any criminal activity he may have been involved in.   Defendant views his conduct as being a simple record keeping offense while at the same time asserting that he had never even seen the record in question and had no idea what was in it despite his numerous signatures in it.   Such a view is not compatible with acceptance of responsibility.   Furthermore, defendant has not identified or articulated any

factor that would support a post-trial acceptance of responsibility reduction pursuant to Section 3E1.1, Application Note 2.

XI.   **A Sentence of 37-46 Months of Incarceration Complies with the Factors and Considerations Set Forth in 18 U.S.C. § 3553(a) and (b).**

In *United States v. Booker*, 543 U.S. 220, 264 (2005), the Supreme Court made clear that sentencing courts should "consult [the Sentencing] Guidelines and take them into account when sentencing." *See also United States v. Biheiri*, 356 F.Supp.2d 589, 593 (2005) ("Justice Breyer's majority opinion in [*Booker*] sensibly teaches that the Sentencing Guidelines must still be taken into account pursuant to 18 U.S.C. § 3553(a) in fashioning an appropriate sentence.").   The Supreme Court provided this direction to promote the sentencing goals of Congress, namely to "'provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities[.]'"   *Booker,* 543 U.S. at 264 (*quoting* 28 U.S.C.

§ 991(b)(1)(B).   The Fourth Circuit has provided the following guidance in the wake of *Booker*:

> A district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines.   Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).   Thus, sentencing courts must consider the factors outlined in 18 U.S.C. § 3553(a), including the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct."   18 U.S.C. § 3553(a)(2)(A) and (B); *Biheiri*, 356 F.Supp.2d at 594.

Section 3553(a) requires a sentencing court to consider the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to:   reflect the seriousness of the offense, promote respect for the law, provide just

punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.   Applying these sentencing factors to the facts of this case demonstrates that a sentence of 37-46 months of incarceration is appropriate and reasonable.

The intentional discharge of oil into the sea from ships is a major problem and the amount of oil discharged each year has been estimated to be over eight times the amount of oil spilled from the Exxon Valdez.   *See* Exhibit C at 4.   MARPOL Protocol, 1340 U.N.T.S. 61.   The Coast Guard is charged with inspecting ships and enforcing MARPOL.   Because of the volume of commercial shipping coming to the United States, the only way the inspection regime can work properly is if the Coast Guard is able to rely on the accuracy of the records maintained by crewmembers on inspected vessels.   If records are intentionally falsified, Coast Guard inspectors are not able to determine whether a vessel is properly disposing of its oily waste.   In this case, defendant engaged in a conspiracy to prevent the Coast Guard from learning what was truly happening with its bilge waste and to deceive the Coast Guard in order to conceal intentional overboard discharges of oil.   It is the defendant's intentional effort to prevent the Coast Guard from figuring out what was actually happening on the ship – the illegal discharge or machinery space bilge waste and hiding the magic pipe - that is the gravamen of these offenses.

Defendant is a trained and licensed engineer who had been at sea for a number of years. As a part of his licensing and credentialing he became perfectly aware of the requirements of MARPOL and that the United States Coast Guard would inspect the vessel to determine if it is in compliance.   Despite that knowledge, defendant chose to intentionally violate the law, thus demonstrating his complete lack of respect for the law.   Defendant has tried to insulate his actions

14

by stating that the Chief Engineer is the only one who is responsible for making recordings in the Oil Record Book and he claims that he never even saw the Oil Record Book and had no idea what was in it.   This despite the fact that from the time he boarded the vessel he routinely signed the Oil Record Book on a near weekly basis.   That he now claims he had no idea what was in the Oil Record Book also demonstrates he has no respect for the law.   A Guidelines sentence would in this case also promote respect for the law.

A Guidelines sentence would also provide a just punishment for the crimes and act as a deterrent not only to defendant committing future crimes of this nature, but also deterring other mariners from committing these crimes.   The maximum punishment for a violation of 18 U.S.C. § 1519 is 20 years of incarceration.   The base offense level for a violation is 14, which equates to 1.25 to 1.75 years of incarceration out of a potential of 20 years.   The guidelines recognize that there are varying levels of severity of obstruction and provides numerous specific offense characteristics to address levels of severity.   As noted in the background of Section 2J1.2 "This section addresses offenses involving the obstruction of justice generally prosecuted under [18 U.S.C. § 1519]…the specific offense characteristics reflect the more serious forms of obstruction." In this case, the Guideline offense level after taking into consideration defendant's role in the offenses, the discharges, subordination of perjury, and grouping two sets of offenses, is a total of 21.   The Guideline sentence is 37 to 46 months of incarceration.   This equates to only 15% - 19% of the statutory maximum for the offenses.   This level of punishment is appropriate and will also further provide adequate deterrence from future offenses.

A Guidelines sentence would also not pose an unwarranted sentencing disparity.   There have been numerous cases in which engineers have pled pre-indictment to an APPS count and received sentences ranging from probation to 12 months and a day of incarceration.   Most of

those cases involve cooperation and acceptance of responsibility in the context of a plea agreement and did not involve subordination of perjury.   The most analogous case in this regard is *United States v. Alejandro Gonzalez*, No. 1:11-CR-20868 (S.D. Fla.).   In *Gonzalez*, the defendant was charged with and convicted by a jury of obstruction of justice, 18 U.S.C. § 1505, for falsely certifying to the Coast Guard that certain complete inspections and surveys of a vessel were carried out when in fact they were not.   The Guidelines for 18 U.S.C. § 1505 and 18 U.S.C. § 1519 are the same base offense level of 14. USSG §2J1.2.   In *Gonzalez*, the court added a 2 point enhancement for use of a special skill under Section 3B1.3, since the defendant was a marine surveyor.   This brought the Gonzalez's overall offense level to 16 with a Guidelines incarceration range of 21-27 months.   The defendant did not testify at trial and did not suborn perjury.   The Court sentenced the defendant to 21 months incarceration, on the low end of the Guidelines range.

The defendant's conduct cannot go unpunished.   A stiff sentence of incarceration will deter him from future misconduct.   A stiff sentence of incarceration also sends a message to the community at large that such conduct will not be tolerated and will be punished when detected. Such a message is imperative in a community such as the Hampton Roads area that has such a large and important commercial maritime presence.

## XII.   A Downward Departure is Unwarranted

The defendant urges this Court to depart downward because the Sentencing Guideline for 18 U.S.C. § 1519 "significantly overstates the seriousness of the offenses for which Boumpoutelos was convicted and is outside the heartland for this record-keeping offense…"   ECF Doc 125 at 2. Relying upon the logic espoused in *Sanford*, defendant's further argue that the false entries were made in the oil record book when "there was no pending, imminent or even foreseeable Coast Guard investigation."   *Id*. at 4.   Despite defendant's contentions, his case is factually

16

distinguishable from *Sanford* and a downward departure is unwarranted.

Unlike the defendant in *Sanford*, the defendant in the instant case was convicted of more than just a record keeping offense.   Unlike defendant Sanford, defendant Boumpoutelos stands before the Court of having been convicted of conspiracy and obstruction of justice, in addition to a "record-keeping offense."   The evidence at trial established that defendant was a manager and supervisor in a conspiracy, not only to falsify the oil record book, but to also illegally discharge oily water and to conceal the "magic pipe" from Coast Guard inspectors.   Such conduct distinguishes this case from *Sanford* as defendant Boumpoutelos' conduct was more extensive and serious than a mere "record-keeping offense."

Furthermore, the defendant's reliance on the *Sanford* decision is misplaced as it is factually distinguishable from the instant case.   In *Sanford* the defendant was not on board the vessel when the Coast Guard inspection occurred and therefore he did not present the oil record book to the Coast Guard.   If that had been the case, it is clear the *Sanford* court <u>would</u> have used Section 2J1.2 as the appropriate guideline in that case.   *See* ECF Doc 125-1 at 28, ("But when [the defendant] wasn't there to lie to the face of the Coast Guard agents, to present – actually present the book to obstruct that investigation, to tell crew members to lie, so he didn't engage in that next step of obstructive conduct that I think might have *easily* qualified him for application of 2J1.2") (emphasis added).   In the instant case, defendant was onboard the vessel during the inspection, lied to the Coast Guard, presented a false oil record book, and instructed the crewmembers to lie to the inspectors.   Therefore, because even the authority the defendant relies upon agrees, the defendant should receive the higher base offense level under Section 2J1.2 of the sentencing guidelines.

Finally, the government respectfully disagrees with the court's ruling in the *Sanford*

17

decision insofar as it pertains to the idea that a Coast Guard inspection is not foreseeable. Defendants such as Boumpoutelos and Prokakis with their decades of maritime experience know that they are subject to a possible Coast Guard inspection of their vessel and records every time they enter a port of the United States. They also know that their oil record book is the primary record that will be examined to ensure compliance with MARPOL. Such knowledge on the part of defendant places this offense squarely in the heartland of conduct that is to be deterred by 18 U.S.C. § 1519 and by extension, Section 2J1.2 of the Sentencing Guidelines as it is conduct designed to frustrate a future investigation. Indeed, the *Sanford* court's logic ignores the fact that the only rationale behind falsifying an oil record book is to obstruct a potential investigation. Certainly, a false oil record book does not confer a commercial advantage to the corporation. Nor does it provide a benefit to the safe navigation or operation of the vessel. Falsifying an oil record book can serve only one true purpose: to obstruct an investigation concerning the vessel's compliance with MARPOL. As such, Section 2J1.2 is the appropriate guideline and the defendant should not be awarded a downward departure.

## XII. <u>Conclusion</u>

Therefore, for the foregoing reasons, and other reasons to be more fully articulated at the sentencing hearing, the United States submits that a sentence of 37-46 months of incarceration is reasonable and accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

DANA J. BOENTE
ACTING UNITED STATES ATTORNEY

By:    _____/s/_____
       Joseph L. Kosky
       Assistant United States Attorney
       Attorney for the United States
       United States Attorney's Office
       101 West Main Street, Suite 8000
       Norfolk, Virginia 23510
       Office Number (757) 441-6331
       Facsimile Number (757) 441-3205
       E-Mail Address - joseph.kosky@usdoj.gov

ROBERT G. DREHER
ACTING ASSISTANT ATTORNEY GENERAL
Environment and Natural Resources Division
United States Department of Justice

By:    _____/s/_____
       Kenneth E. Nelson
       Trial Attorney
       Environmental Crimes Section
       United States Department of Justice
       601 D. Street, NW, Suite 2814
       Washington, DC 20004
       Office Number (202) 305-0435
       Facsimile Number (202) 514-8865
       E-Mail Address – kenneth.nelson@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of November, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Michael G. Chalos, Esquire
Chalos O'Connor, LLP
366 Main Street
Port Washington, New York 11050
mchalos@codus-law.com

Trey R. Kelleter, Esquire
Vandeventer Black, LLP
500 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
tkelleter@vanblk.com

Carl Woodward, Esquire
Carella, Byrne, Cecchi, Olsen, Brody, & Agnello, P.A.
5 Becker Farm Road
Roseland, New Jersey 07068
cwoodward@carellabyrne.com

Lawrence Woodward, Jr., Esquire
Shuttleworth, Ruloff, Swain, Haddad & Morecock, P.C.
4525 South Boulevard, Suite 300
Virginia Beach, Virginia 23452
lwoodward@srgslaw.com

Michael K. Twersky, Esquire
Fox Rothschild, LLP
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103
mtwersky@foxrothschild.com

Patrick H. O'Donnell, Esquire
Kaufman & Canoles
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
phodonnell@kaufcan.com

_____/s/_____
Joseph L. Kosky
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number (757) 441-6331
Facsimile Number (757) 441-3205
E-Mail Address - joseph.kosky@usdoj.gov